IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                     PLAINTIFF/RESPONDENT

V.                      Civil No. 12-5039
                        Criminal No. 09-50035

MARCIO DE OLIVEIRA                             DEFENDANT/MOVANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Currently before the undersigned is a 28 U.S.C. § 2255 motion filed by the Defendant/Movant Marcio De Oliveira (hereinafter "the Defendant") on March 1, 2012. (Doc. 68.) The Government has filed a Response and the Defendant has filed a Reply. On January 8, 2013, the undersigned conducted a hearing to take testimony from the Defendant to verify the factual basis for his claims, as a fellow inmate assisted the Defendant in the drafting of all documents in this matter and the undersigned wished to ensure that this inmate did not misstate the facts supporting Defendant's claims in any way. (Doc. 95.) Having verified the factual basis for Defendant's claims, the undersigned determined that Defendant should be appointed counsel and that an evidentiary hearing should be conducted. (Docs. 106, 107.) The hearing was conducted on September 3, 2013, a transcript of that hearing was filed on October 28, 2013 (Doc. 127), and the matter is now ripe for consideration.

## BACKGROUND

1. On March 25, 2009, Special Agent Paul Cottrell ("Agent Cottrell") of United States Immigration and Customs Enforcement ("ICE") received a tip that numerous undocumented workers were living in extremely poor conditions in two homes in Springdale, Arkansas. Upon investigating the situation, Agent Cottrell learned that twenty-four undocumented workers lived in the residences and that twenty-three of them were employed by Defendant, a citizen of Brazil with permanent resident status in the United States. The workers were hired to lay cable for Allwire Communication ("Allwire"), which had subcontracted with Defendant through his company, Molink Underground Construction Services, based in Tennessee, where Defendant lived. United States v. DeOliveira, 623 F.3d 593, 594-95 (8th Cir. 2010).

2. On April 22, 2009, a four-count indictment was issued charging that the Defendant, knowingly and in reckless disregard of the fact that four named aliens had come to, entered, and remained in the United States illegally, concealed, harbored and shielded these aliens from detection by providing housing, employment and transportation, for the purpose of commercial advantage or private financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).

3. Defendant was scheduled to proceed to trial on Monday, August 31, 2009. On Friday, August 28, 2009, the Defendant, represented by his retained attorney, Mr. Herbert Southern,

pleaded guilty, pursuant to a written plea agreement (Doc. 23), to two counts of harboring illegal aliens.

    4.    At the change of plea hearing, District Court Judge Jimm Larry Hendren inquired regarding the stipulation of facts contained in the plea agreement:

THE COURT: One thing I want to ask on a point of clarification . . . . It says that when Agent Cottrell asked the defendant if he knew the workers were foreign nationals, he nodded his head in the affirmative. Now, did that mean that you were saying, yes, you knew that . . . [they were] foreign nationals?

THE DEFENDANT: Yes

THE COURT: And you knew they were here illegally?

THE DEFENDANT: No.

MR. SOUTHERN: Well, you did know that you didn't have verification that they were legal, and you hadn't - -

THE DEFENDANT: Yes.

MR. SOUTHERN: - - pursued to - -

THE DEFENDANT: Yeah.

MR. SOUTHERN: - - ascertain - -

THE DEFENDANT: Yeah.

MR. SOUTHERN: So it's reasonable to say that you did know, or should have known, that they were illegals; is that correct?

THE DEFENDANT: That is correct.

MR. SOUTHERN: Okay.

THE COURT: I don't think it's a crime to harbor foreign nationals. I think it's a crime to harbor if

>they're illegal aliens, and I don't want there to be any question about that. Do you concede, Mr. Southern, that he admits on the record he knew they were illegal aliens?

MR. SOUTHERN:  Yes, Your Honor, I do.

THE COURT:     Is that true, Mr. - -

THE DEFENDANT: Yes, sir.

(Doc. 49 at pgs. 13-14.)

5. Defendant's sentencing hearing was scheduled for February 1, 2010. Mr. Southern filed numerous objections to the Presentence Investigation Report, one objection being to the denial of acceptance of responsibility. Mr. Southern argued that Defendant "pled guilty at the hearing to the fact that he *should have ensured* the status of the workers but did not." (Obj. No. 3) (emphasis added).

6. On January 27, 2010, Mr. Milton DeJesus filed a motion seeking to be substituted as counsel for the Defendant and Mr. Southern filed a motion seeking to withdraw as counsel. (Docs. 25, 28.) On that same date, Mr. DeJesus filed a motion seeking to withdraw Defendant's guilty plea, asserting as grounds:

> [H]is plea agreement was made under duress or otherwise coerced through the fear instilled in him by his counsel that the outcome at trial would be disastrous. . . . [His] attorney was not committed or prepared for trial on that Friday prior to trial; . . . at the eleventh hour defense counsel changed the entire game-plan after previously advising them of a strong defense and thus they were faced with a plea on Friday or a disaster on Monday. Defendant states that he was committed to his innocence and with great reluctance and reservation agreed to a change of plea. . . . A review of the pre-sentence report prepared, completed and mailed on

> November 19, 2009[,] by Ms. Donna Brown highlights at paragraph 73 her misgivings that defendant has not accepted his responsibility, specifically as to his stated lack of knowledge about the unauthorized presence of the workers.  Even at the point of discussions with Ms. Brown defendant still asserts his innocence. . . . The salient issue is "knowledge" and defendant steadfastly asserts to Ms. Brown that he did not know that the workers were unlawfully present. . . .
>
> Current counsel's assessment of the evidence indicate[s] that the element of "knowing" is clearly defensible since the defendant did not prepare any I-9, did not see any of the documentation provided with any I-9; that I-9's were prepared by a crew leader, sent to defendant's "boss" (Allwire) and those I-9's were reviewed by defendant's "boss"; defendant's "boss apparently was satisfied with the I-9's and supporting documentation; and defendant's "boss" issued Allwire company identification to each employee and told defendant that these persons are cleared to work.  There is no evidence that any employee told defendant that they are undocumented or unauthorized to work; nor did defendant ever tell anyone to obtain documents.

(Doc. 27 at pgs. 2-6.)

7.   The date Defendant was scheduled to be sentenced, February 1, 2010, Judge Hendren conducted a hearing on Defendant's motion to withdraw his guilty plea and denied the motion, finding:

> There's no question in my mind that [Defendant] knew and admitted under oath in front of this Court that he knew that these were illegal aliens, and there is no evidence that I've seen that would suggest otherwise. . . .
>
> [T]he question I have in front of me today, is there a basis to conclude that it would be fair and reasonable to allow [Defendant] to withdraw his guilty plea.  The only thing I've heard to suggest that is, "Well we were misled by Mr. Southern right up to the brink of the trial to think that maybe we could defend this, and . . . the [D]efendant should be allowed to take back his plea and actually have a trial because he believes, as does his new attorney, Mr. DeJesus, that perhaps the

      case could be defended." Those are not acceptable reasons to permit the withdrawal of a guilty plea.

(Doc. 78 at pgs. 74, 77-78.)

    8.  Judge Hendren proceeded to the sentencing hearing, at which, Agent Cottrell testified in detail about the investigation leading to Defendant's arrest. According to Agent Cottrell, Allwire was a subcontractor of Cox Communications. Defendant's company, Molink, was essentially a subcontractor of Allwire that was hired to dig ditches to lay underground cable. Agent Cottrell testified that, according to the general manager for Allwire, Defendant was not allowed to subcontract the work and Agent Cottrell understood the undocumented workers to have been hired as employees of Defendant's company. The employees worked laying cable for approximately four weeks before Defendant's arrest on March 27, 2009. Agent Cottrell testified that the employees identified their supervisors as Carmelino Chacon and Leonel Benavides. When asked whether any of the workers identified the Defendant, Agent Cottrell testified, "They only knew that the supervisors were Carmelino and Leonel, and that the owner of the company and the individual that they received their work direction from was [Defendant]." (Doc. 47 at pg. 89.) The workers did not recall the Defendant ever being at any of the job sites. Agent Cottrell testified that the workers believed checks were going to be sent to their supervisors, Chacon and Benavides, and that the supervisors would then cash the checks and pay the workers in cash. Four of the workers were deposed and all stated that they

had not filled out an I-9 Form[1] to obtain employment with Defendant. When asked what his investigation revealed about Defendant's role with regard to the undocumented workers, Agent Cottrell testified:

> He was the owner of Molink. He was the operator of the company. He was the individual that signed the contract with Allwire. He was the individual that admitted that he directed their work. He was the individual that rented the homes for these workers, provided them a truck, rented equipment . . ., and the only funds that we could trace that were actually received by these individuals was $1,000 that was sent to Leonel Benavides during the entire period of time of their employ. . . . Carmelino Chacon's role . . . was [as] a recruiter. He was a boss. He was responsible to report to [Defendant] in his business. He received his orders and his directions from [Defendant], and he was the individual that liaisoned with the employees on the ground here in Arkansas, as did Leonel Benavides. . . . Both gentlemen were supervisors for [Defendant].

(Id. at pgs. 101-02, 106.)

Agent Cottrell testified that the workers were not local and that Chacon and Benavides each brought a crew of about 13 workers with them to Arkansas from various parts of the United States, such as Texas, New York, and Tennessee. Agent Cottrell acknowledged that the workers were required to obtain Allwire identification badges and that they had to show identification to Allwire to obtain these badges. According to Agent Cottrell, Allwire obtained copies of various forms of what appeared to be

---

[1] An I-9 form is an employment eligibility verification form that all employers are required to complete and retain for each individual they hire for employment in the United States. The employer must indicate on the form that identity documents have been examined and appear to be genuine. See United Stats v. Mejia-Flores, 2012 WL 525485, *1 n.1 (D. Neb. 2012) (citing United States Citizenship and Immigration Services website at www.uscis.gov).

valid identification from the workers, such as state issued identification cards, social security cards, and alien registration cards.

9. Judge Hendren denied Defendant acceptance of responsibility, overruled the majority of his other objections to the Presentence Investigation Report, and sentenced Defendant to fifty-one months imprisonment on each of the two counts, with the sentences to run concurrently. (Doc. 37.)

10. Defendant appealed, challenging the denial of his motion to withdraw his guilty plea and three sentencing enhancements. The Eighth Circuit Court of Appeals affirmed the denial of Defendant's motion to withdraw his guilty plea, but reversed and remanded the case for resentencing on the issue of whether there was a sufficient factual basis to support a vulnerable victim enhancement. See De Oliveira, 623 F.3d 593.

11. On February 14, 2011, Defendant was resentenced and an amended judgment was entered sentencing Defendant to 33 months imprisonment on each count, with the sentences to run concurrently. (Doc. 65.)[2]

12. On March 1, 2012, Defendant filed the § 2255 motion currently before the Court. (Doc. 68.)

### GROUNDS ASSERTED IN 28 U.S.C. § 2255 MOTION

13. Defendant asserts essentially two grounds for relief.

---

[2] Defendant has served his term of imprisonment but still faces deportation and is being held in the custody of Immigration and Customs Enforcement pending resolution of his § 2255 motion.

First, Defendant asserts that Mr. Southern provided ineffective assistance of counsel by misadvising the Defendant that he could be convicted if he "should have known" that the workers were illegal, when, in actuality, the law requires that the Defendant "'knew or acted in reckless disregard of the fact that the aliens were not lawfully in the United States.'" (Doc. 71 at pg. 7.) Defendant argues that but for Mr. Southern's "11th hour misadvice," he would not have pleaded guilty and would have insisted on proceeding to trial. (Id. at pg. 9.)

14. Second, Defendant asserts that Mr. Southern provided ineffective assistance of counsel by providing Defendant "'gross misinformation'" with respect to the deportation consequences of Defendant' guilty plea. (Id. at pg. 5.) The undersigned finds it unnecessary to address this ground, because, as discussed below, the undersigned believes that Defendant is entitled to relief on his first claim of ineffective assistance of counsel.

**APPLICABLE LAW**

15. "[T]he two-part Strickland v. Washington[, 466 U.S. 668 (1984),] test applies to challenges to guilty pleas based on ineffective assistance of counsel." Lafler v. Cooper, 132 S.Ct. 1376, 1384(2012). The performance prong of Strickland requires a defendant to show that counsel's representation fell below an objective standard of reasonableness. Id. The prejudice prong requires a defendant to show that the outcome of the plea process would have been different with competent advice. Id.

Specifically, a defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. See Hill v. Lockhart, 474 U.S. 52, 59 (1985); Watson v. United States, 682 F.3d 740, 745 (8th Cir. 2012).

### COUNSEL'S ALLEGED MISADVICE
### REGARDING THE KNOWLEDGE ELEMENT OF THE OFFENSE

16.  The knowledge element of the offense of harboring or concealing an alien requires that a defendant acted with knowledge or reckless disregard of the fact that the alien was in the United States illegally. See 8 U.S.C. § 1324(a)(1)(A)(iii). While there is no Eighth Circuit model jury instruction defining reckless disregard, the Eighth Circuit has approved the following instruction in a prosecution under 8 U.S.C. § 1324(a) for transporting illegal aliens:

> To act with "reckless disregard" means to be aware of, but to consciously or deliberately ignore, facts and circumstances clearly indicating that the person being transported was an alien who had entered or remained in the United States in violation of law.
>
> You may not find that the defendant acted knowingly, however, if you find that the defendant actually believed that the aliens were legally present in the United States or if you find that the defendant was simply careless. A showing of negligence, mistake or carelessness is not sufficient to support a finding of knowledge.

United States v. Garcia-Gonon, 433 F.3d 587, 590-91 & n. 2 (8th Cir. 2006). The jury instruction submitted by the Government to

the Court in preparation for trial was substantially similar to this instruction. (Court's Ex. 1.)

17. At the evidentiary hearings on his § 2255 motion, Defendant testified that he knew he was innocent and that, leading up to trial, Mr. Southern assured him that he had a strong case and there was "no way [he was] going to lose. . . ." Defendant testified that on the eve of trial, Mr. Southern changed his mind and urged him to plead guilty because all the Government had to prove was that he "should have know[n]" the workers were illegal and the Government would have no difficulty proving this. (Doc. 110 at pgs. 16-17; Doc. 127 at pg. 562.)

18. Defendant's testimony that Mr. Southern advised him that the Government only had to prove that he should have known the workers were illegal is supported by the fact that in Mr. Southern's objections to the Presentence Investigation Report, Mr. Southern argued that Defendant should receive acceptance of responsibility because he pled guilty to the fact that he "*should have ensured* the status of the workers but did not." (Obj. No. 3) (emphasis added). Defendant's testimony is also supported by the advice Mr. Southern gave him at the plea hearing when Judge Hendren inquired as to whether Defendant knew the workers were in the United States illegally. Defendant initially denied knowing the workers were illegal. Mr. Southern then interjected that the Defendant did not have verification that the workers were legal and asked the Defendant on the record, "So it's reasonable to say

that you did know, or *should have known*, that they were illegals; is that correct?" (emphasis added)  Defendant responded, "That is correct."  Mr. Southern then conceded to Judge Hendren that Defendant knew the workers were illegal aliens and when Judge Hendren asked the Defendant if that was true, Defendant responded, "Yes, sir."  (Doc. 49 at pgs. 13-14.)

Mr. Southern testified that, during this exchange, he "think[s]" he "probably" whispered to the Defendant off the record something in the nature of "But you really did know they were illegal.  You just looked the other way and didn't do anything about it."  (Doc. 127 at pgs. 256-57.)  Mr. Southern could not recall whether the Defendant answered him in the affirmative, but testified, "it's the only thing that makes sense," because "that's the only way that I would have turned to the judge" and conceded Defendant's knowledge.  (Id. at pg. 258-59.)[3]  Mr. Southern acknowledged that, prior to this off-the-record exchange, Defendant had never admitted having knowledge of the workers being illegal.  Mr. Southern further acknowledged that Defendant's admission to Judge Hendren that he knew the workers were illegal could have been based on Mr. Southern's misstatement to Defendant that it was reasonable to say he "should have known."  (Id. at pg. 263.)

---

[3]  The undersigned listened to the recording of the plea hearing and could not hear any whispered exchange; however, it is possible that the microphones simply did not pick up the exchange.

19. Alice Childs, Defendant's wife at the time in question, testified, when asked if Mr. Southern ever explained the knowledge element of the offense to Defendant, that Mr. Southern "kept telling [Defendant] he should have known . . . that these people were not here legally."  (Id. at 539.)

20. Rebecca Drury, Defendant's sister-in-law at the time in question, testified that the morning of August 28, 2009, Ms. Childs called her and wanted her to be on speaker phone for a discussion with Mr. Southern about whether the Defendant should plead guilty.  Ms. Drury testified that Defendant's "big concern was, 'I - - I'm being pushed to lie.  I don't want to take a plea and lie.'"  Ms. Drury testified that Mr. Southern explained, "[T]here are basically four - - four levels of guilt that are possible.  The top two are not even part of the equation.  The bottom two are saying you didn't know you were doing wrong, you didn't mean to do wrong, and you could have been more careful." Ms. Drury asked Mr. Southern, "You're saying that if [Defendant] takes the plea, he really isn't lying, that he's not really admitting to anything in this plea? . . . [H]e's just basically saying that he could have been more careful with the paperwork? And [Mr. Southern] said, 'Yes.'" (Id. at 544, 550-51.)

21. Based upon the foregoing, the undersigned credits Defendant's testimony that Mr. Southern misadvised him that the knowledge element of the offense required only that he should have known the workers were illegally present in the United States.

Defendant has, therefore, met his burden of establishing that Mr. Southern's representation fell below an objective standard of reasonableness.

22. The next question then is whether Defendant can demonstrate prejudice by showing a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial. The undersigned believes that Defendant has met his burden in this regard.

Defendant maintained his innocence and denied having knowledge of the workers being illegal from the initial phases of his case; at the plea hearing (until prompted to admit knowledge by Mr. Southern); in his motion to withdraw his plea; and even during the sentencing phase when he was interviewed by the probation office, which resulted in him being denied acceptance of responsibility; and in his motion to withdraw his guilty plea. Further, Defendant had at least a plausible theory of defense. Mr. Southern testified that his theory of the case had been:

> [Defendant's] behavior, while it might have been careless, he wasn't calling the shots. It was Carmelino and Leonel. . . . Basically, the theory of my defense, which was bolstered by the four depositions of the material witnesses, was that Defendant did not have any contact with these guys, that they were working for . . . either Carmelino or Leonel. . . . [N]one of these guys knew [Defendant]. . . . [T]hey'd been told they were working for [Defendant], but they didn't know [Defendant] from you or me. . . . [Defendant's] position was that he didn't know these guys. He hadn't hired them. He . . . had relied on others to make sure that they were legal. In the depositions, the four people all admitted that they didn't know him, had never seen

> him, had never talked to him, never accepted work from him. . . .

(Id. at pg. 166, 196, 272.)

Mr. DeJesus also believed the case to be defensible on a theory of Defendant's "reasonable reliance" on Allwire:

> Allwire was, I think, . . . an intermediary. I think that Allwire vetted all of the employees, and Allwire provided the employees with name badges and identification to be employed for Allwire. So my strategy would have been to argue and to somehow bring in Allwire to show that they, in fact, interviewed the clients, passed on whether or not they were authorized to be employed, and then Allwire, I think, would have been responsible and would have taken responsibility away from [Defendant] to have determined whether or not they were authorized to be employed.

(Id. at 348-49.)

Accordingly, the undersigned believes that Defendant's claim that Mr. Southern provided ineffective assistance of counsel in misadvising him as to the knowledge element of the offense is a meritorious claim and that Defendant is entitled to relief on this claim. It is, therefore, unnecessary to address Defendant's remaining claim for relief.

## CONCLUSION

23. Based upon the foregoing, the undersigned recommends GRANTING Defendant's § 2255 motion (Doc. 68), vacating Defendant's guilty plea, and setting the case for trial.

**The parties have fourteen days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may**

**result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED March 20, 2014.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE